

## NUMBER 13-07-00250-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**DAVID FORD,**                                                                                   **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                   **Appellee.**

### On appeal from the 94th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Justices Yañez, Rodriguez, and Benavides**
**Memorandum Opinion by Justice Rodriguez**

A jury convicted appellant, David Ford, of assault on a public servant and assessed

his sentence at four years' imprisonment.  *See* TEX. PENAL CODE ANN. § 22.01 (Vernon

Supp. 2008).  By four issues, Ford contends: (1-2) the trial court committed reversible error

by not including the lesser included offense of misdemeanor assault and the issues of self-

defense and necessity in its jury charge; (3) the trial court committed reversible error by allowing the State to introduce evidence of Ford's alleged confession to a state jail nurse; and (4) the evidence was factually insufficient. We affirm.

## I. BACKGROUND

During Ford's trial, the State presented the testimony of Amy Hartnett, R.N., and Officers Victor Uribe, Juan Roberto Reyes, Jacob Garza, Rolando Arias, Patrick McMenamy, Steven Gohlke, Frank Bautista, and Rosemary Sifuentes. According to Officer Uribe, while responding to a complaint that a man was "trying to start some fights," he discovered Ford lying on the ground between two buildings. When Officer Uribe attempted to "make contact with him [Ford], he was totally out of it." Ford was belligerent, cursing, and "getting kind of violent." When Officer Uribe asked Ford for his name, Ford answered, "You bitch." Officer Uribe looked in Ford's wallet for identification and found a driver's license belonging to Charles Teague. The photograph on the driver's license "looked very similar to [Ford]." Officer Uribe arrested Ford on suspicion of public intoxication and transported him to the City Detention Center (CDC). Once at the CDC, Ford was admitted under the name Charles Teague.

Officer Garza testified that, after Ford was placed in a holding cell at the CDC, Ford made a racial epithet and spat at him. Officer Reyes testified that Officer Garza called for assistance because Ford was spitting and acting aggressively. Officer Garza stated that "[w]hen an arrested person becomes — when he's that intoxicated and makes those types of actions, he is put in restraints and a spit shield is applied to prevent him from spitting." According to Officer Garza, it is essential that a prisoner who spits is restrained in order to "prevent him from harming himself and other . . . inmates or officers" because the prisoner

2

may have a communicable disease. Officer Reyes testified that he and Officers Bautista and Sifuentes assisted Officer Garza with restraining Ford. According to Officer Reyes, the officers restrained Ford using a maneuver he believed was called a "leg sweep."[1] Ford was later released from his restraints, given a shower, and moved to another holding cell.

When Officers McMenamy and Gohlke arrived at the CDC to process another prisoner, Officer Garza asked them to thank the officers in their department for bringing Teague to the CDC. Officers McMenamy and Gohlke informed Officer Garza that the prisoner could not be Teague because he was currently in prison. Officers McMenamy and Gohlke went to Ford's cell and, after "observing Ford's face," Officer Gohlke identified the prisoner as David Ford. Once the officers stated that the prisoner was Ford, Officer Garza began the process of positively identifying him. According to Officer Garza, fingerprints could not be taken because of Ford's belligerence and combativeness. Instead, he had to rely on a mug shot on file.

The mug shot showed that Ford had a scar on the bridge of his nose. Officer Garza went to Ford's cell to look for the scar. When he entered Ford's cell, he moved Ford in an effort to awaken him so that he could look at his face. Ford awoke and grabbed a phone receiver and swung it at him. Officer Garza "walked with him . . . towards the corner and did what [is] call[ed] an arm drag to take him down."[2] Officer Arias went into the cell to assist Officer Garza. During the struggle, Ford repeatedly shouted an obscenity and said, "I want to play." According to Officer Garza, he could not get Ford's hand behind his back

---

[1] Officer Reyes stated that when restraining a prisoner using a "leg sweep," the officers "try to bring [the prisoner] down slowly, bring his feet from under him and bring him down."

[2] Officer Garza described an "arm drag" as a procedure "where you grab them [prisoners] by the arm and you assist them down to the ground."

to cuff him, and Ford "kept trying to grab his hand . . . . And at that point is when [Ford] was free and Officer Arias was struck in the head." Officer Garza stated:

> Once we realized that we were not able to cuff him from behind, we ended up cuffing him in front. Once that was done, we leg ironed his legs together. And we ended up having to cuff him from cuff to leg iron to keep him from – you know, to control him.

Officer Garza explained that Ford then wrapped his legs around Officer Arias's leg and would not release it. He had to move "the shackle up to where – right around . . . [Ford's] shin area and tensed it down. And at that point he released [Officer Arias's] leg." Officer Garza testified that Officer Arias was injured during the struggle.

Officer Arias testified that he heard yelling and banging from an open cell. He ran to the cell and found Officer Garza struggling with Ford. When asked to describe the struggle, Officer Arias stated,

> To me it seemed like [Officer Garza] was trying to restrain [Ford]. And [Ford] was on his back trying to – I mean, he wasn't wanting to give up. He wasn't wanting to turn around. I went in right away and grabbed one of his hands. And I repeatedly told [Ford], stop resisting, just relax, relax, stop resisting. And he just kept going.

Officer Arias stated that Ford was kicking, spitting, cursing, and shouting, "I want to play." According to Officer Arias, when Officer Garza released Ford's cuffed hand, Officer Arias grabbed that hand, and, while Ford's other hand was free, Ford hit Officer Arias on his head. Officer Arias stated that he was hit hard and felt pain.

Ford was then transferred to the county jail. Hartnett, who works as a nurse at the jail and who is employed by Christus Spohn Memorial Hospital, testified that when a prisoner arrives at the jail they are automatically sent to the nurse's station to "insure that the person is healthy enough to be placed in a holding cell." Hartnett observed Ford to be

4

conscious; he did not appear drowsy, he could walk, and he did not complain of any pain. Hartnett described Ford's appearance as "disheveled," and noticed a prominent red mark over his eye. Ford initially refused to answer Hartnett's questions, but eventually told her that "he had assaulted an officer and they had taken him down and somehow in that process he had gotten injured." According to Hartnett, Ford stated that "he had swung at an officer and he – somehow after that, you know, when they subdued him, he got injured." When asked what Ford had swung at the officer, he "mentioned a telephone." Hartnett explained that she documented Ford's explanation on a county jail form that he did not sign because he was in handcuffs.[3]

Ford testified on his own behalf. He stated that on the day he was arrested, he had ingested half a gallon of tequila, an "eight ball of cocaine," which he described as an eighth of an ounce of cocaine, and "a little over a gram of methamphetamine." Ford also stated that he takes medication for his depression. According to Ford, if he mixes cocaine and "meth" with his medication, he will "black out." Ford claimed that he did not recall being taken to the CDC and did not realize that he had been incarcerated. Ford stated, "I don't remember anything in the [CDC]." However, he remembered telling the officers that he was not Teague and that he was David Ford. Ford also remembered talking to Hartnett, who he said woke him up and told him that he had assaulted someone and that he had spat at the officers at the CDC. Ford claimed that he told Hartnett that he did not know what happened at the CDC and that he had ingested half a gallon of tequila. Ford stated that he refused to sign the acceptance form presented to him by Hartnett because it stated that he had assaulted an officer.

---

[3] This form was admitted through Ford's testimony as defense exhibit five.

On cross-examination, Ford explained that he had Teague's driver's license in his wallet because he had used it to acquire medical attention after he was shot in the foot. Ford stated that he did not remember anything that happened at the CDC except being struck in the face by Officer Garza. Ford maintained that he did not recall hitting Officer Arias and stated, "I don't think I hit him. In my – by my remembrance, I don't think I hit him."

The jury found Ford guilty of assault on a public servant and assessed his punishment at four years' imprisonment. This appeal ensued.

## II. JURY CHARGE

By his first issue, Ford contends the trial court committed reversible error by denying his request to include an instruction in the jury charge of the lesser-included offense of misdemeanor assault. Specifically, Ford argues that some evidence existed to show that the officers at the CDC used excessive force against him and that he did not know that Officer Arias was a public servant. By his second issue, Ford contends that the trial court committed reversible error when it denied his request for jury charge instructions on the issues of self-defense and necessity.

### A. LESSER-INCLUDED OFFENSE

#### 1. Applicable Law

##### a. Elements of Lesser-Included Offense

A defendant is entitled to an instruction in the jury charge of a lesser-included offense if (1) the lesser-included offense is included within the proof necessary to establish the charged offense, and (2) some evidence exists in the record permitting a rational jury to find that if the defendant is guilty, he is guilty of only the lesser offense. *Bignall v. State*,

6

887 S.W.2d 21, 23 (Tex. Crim. App. 1994) (en banc); *Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005); *see* TEX. CODE CRIM. PROC. art. 37.09(1) (Vernon 2006) (providing that if an offense "is established by proof of the same or less than all the facts required to establish the commission of the offense charged," it is a lesser included offense). In this case, under the second prong, there must be some evidence from which a rational jury could acquit appellant of assault on a public servant while convicting him of the lesser-included offense of misdemeanor assault. *Hall*, 158 S.W.3d at 473. We review all of the evidence presented to the trial court to determine if it erred by failing to include an instruction in the charge on the lesser-included offense. *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993) (en banc).

### b. Misdemeanor Assault

A person commits misdemeanor assault if the person "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01 (Vernon Supp. 2008). In *Hall v. State*, the court of criminal appeals concluded that misdemeanor assault is included within the proof necessary to establish assault on a public servant. 158 S.W.3d at 473.

### c. Assault on a Public Servant

The offense of assault on a public servant requires proof of misdemeanor assault and the following four additional elements: (1) the person assaulted was a public servant; (2) the defendant knew that the person he assaulted was a public servant; (3) the person assaulted was discharging official duties when he was assaulted; and (4) the person assaulted was lawfully discharging those official duties. *Hall*, 158 S.W.3d at 473 (citing TEX. PENAL CODE ANN. § 22.01(b)(1)). "If there is affirmative evidence in the record that

7

negates one of the four additional elements of assault on a public servant, yet admits the underlying assault, appellant would be entitled to a lesser-included charge of misdemeanor assault." *See Hall*, 158 S.W.3d at 474.

The court of criminal appeals has generally interpreted the "lawful discharge of official duties" broadly, such that "as long as the officer was acting within his capacity as a peace officer, he was acting within the lawful discharge of his official duties." *Id.*

> An officer or employee of a correctional facility is justified in using force against a person in custody when and to the degree the officer or employee reasonably believes the force is necessary to maintain the security of the correctional facility, the safety or security of other persons in custody or employed by the correctional facility, or his own safety or security.

TEX. PENAL CODE ANN. § 9.53 (Vernon 2003). A correctional officer is lawfully discharging his duties if his use of force falls within the above definition, and if the officer is assaulted, "the actor is guilty of assault of a public servant rather than mere misdemeanor assault." *Hall*, 158 S.W.3d at 475. However, there are limits to the lawful discharge of official duties, which require that "the public servant is not criminally or tortiously abusing his office as a public servant by acts of, for example, 'official oppression' or 'violations of the civil rights of a person in custody' or the use of unlawful, unjustified force." *Id.* at 474-75.

### 2. Discussion

As stated above, the court of criminal appeals has concluded that misdemeanor assault is included within the proof necessary to establish assault on a public servant. *Id.* at 473. Thus, the first prong entitling Ford to an instruction in the jury charge has been satisfied. *See Bignall*, 887 S.W.2d at 23; *see also Hall*, 158 S.W.3d at 473. We must now determine, under the second prong, whether there is some evidence in the record

8

permitting a rational jury to find that if Ford is guilty, he is guilty only of misdemeanor assault. *See Hall*, 158 S.W.3d at 473-74; *see also Bignall*, 887 S.W.2d at 23.

In his first issue, Ford claims that there is some evidence supporting a finding that Officer Arias was not acting in the lawful discharge of his official duties—thus negating the fourth element of assault on a public servant. Ford would be entitled to the lesser-included instruction only if there is some record evidence, from any source, that showed that Officer Arias criminally or tortiously abused his status as a public servant at the time he was assaulted. *See Hall*, 158 S.W.3d at 475.

Ford alleges that Officer Arias was not lawfully discharging his official duties when Ford hit him because there is some evidence that other officers abused him. Ford argues that a rational jury could find that Officer Arias, as the "shift leader," was "cognizant of, participated [in], and even condoned the excessive force used against" him. Specifically, Ford points to the following: (1) he testified that Officer Garza hit him; (2) Officer Arias had been seen administering ammonia to Ford after the first time Ford was retrained, (3) Officer Arias participated in moving Ford to a cell that was outside the view of the CDC's video cameras; and (4) Ford hit his head on a toilet when he was restrained.

The officers who encountered Ford that day testified that Ford was uncooperative, combative, spitting, shouting obscenities, and that they had to restrain him due to his behavior. Officer Arias stated that the force he used was necessary and not excessive. The evidence presented did not establish that Officer Arias was either aware of or condoned the use of excessive force or that he used excessive force at the time he was assaulted. Although Ford testified that Officer Garza hit him, Ford never testified that Officer Arias used excessive force or that Officer Arias was aware that Officer Garza

9

allegedly hit him.  None of the officers present testified that excessive force was used on Ford.  The evidence presented showed that Officer Arias found Officer Garza struggling to restrain Ford in his cell.  When Officer Arias asked Ford to calm down and stop resisting, Ford shouted obscenities and stated that he wanted "to play."  The evidence also showed that Ford struck Officer Arias in the head while Officer Arias was attempting to assist Officer Garza in restraining Ford.  *See* TEX. PENAL CODE ANN. § 9.53.  Based on the evidence, Officer Arias was acting within his capacity as a peace officer.  Because Officer Arias was acting in the lawful discharge of his official duties, Ford has not negated the fourth element of assault on a public servant.  *See id.*; *Hall*, 158 S.W.3d at 474.

Next, Ford argues that there is some evidence supporting a finding that he did not know that Officer Arias was a public servant because he was in an "incoherent state," negating the second element of assault on a public servant.  However, section 22.01(d) of the penal code specifically provides that "the actor is presumed to have known the person assaulted was a public servant . . . if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant."  TEX. PENAL CODE ANN. § 22.01(d).  Here, Officer Arias was wearing his uniform and a badge at the time Ford struck him; thus, we must presume Ford was aware that Officer Arias was a public servant.  *See id.*  Ford does not contend that he rebutted this presumption.  Nonetheless, we reject any suggestion that appellant rebutted the presumption by alleging that he was in an incoherent state.  "Voluntary intoxication does not constitute a defense to the commission of a crime," and the evidence presented showed that Ford was in an incoherent state at the CDC because he voluntarily became intoxicated by drinking half a gallon of tequila and ingesting cocaine and methamphetamine.  *See* TEX. PEN. CODE ANN. § 8.04(a) (Vernon

10

2003). Therefore, Ford did not rebut the presumption that he knew Officer Arias was a public servant; and, he failed to negate the second element of assault on a public servant. *See Hall*, 158 S.W.3d at 474. Ford does not challenge the first and third elements, and we find nothing in the record that would negate those elements. *See id.* Because there is no affirmative evidence in the record negating one of the four additional elements of assault on a public servant, we conclude that Ford was not entitled to a lesser-included charge of misdemeanor assault. *See id.* We overrule Ford's first issue.

## B. DEFENSES

By his second issue, Ford claims that he was entitled to jury instructions on self-defense and necessity. A defendant is entitled to an instruction in the jury charge on any defensive issue raised by the evidence from any source, regardless of whether the evidence is strong, weak, unimpeached or contradicted, or credible or not credible. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *Hudson v. State*, 145 S.W.3d 323, 324-25 (Tex. App.–Fort Worth 2004, pet. ref'd). "All statutory affirmative defenses 'justify the defendant's admitted participation in the act itself.'" *East v. State*, 76 S.W.3d 736, 738 (Tex. App.–Waco 2002, no pet.) (quoting *Sanders v. State*, 707 S.W.2d 78, 81 (Tex. Crim. App. 1986)). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31 (Vernon Supp. 2008). To raise the issue of self-defense, a defendant must admit to the conduct in the statute under which he is charged. *Withers v. State*, 994 S.W.2d 742, 745 (Tex. App.–Corpus Christi 1999, pet. ref'd). In other words, the defendant must admit

11

that he used force against another before he is entitled to an instruction of self-defense. *See id.*

The affirmative defense of necessity attempts to justify a defendant's conduct that would otherwise be criminal. *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999). A defendant cannot establish that his conduct was justified by "necessity" without first admitting that the conduct occurred. *Wood v. State*, 271 S.W.3d 329, 334 (Tex. App.–San Antonio 2008, pet. ref'd) (citing *McGarity v. State*, 5 S.W.3d 223, 227 (Tex. App.–San Antonio 1999, no pet.)); *Maldonado v. State*, 902 S.W.2d 708, 712 (Tex. App.–El Paso 1995, no writ).

Ford maintains that there is some evidence that he acted in self-defense because his testimony that he did not recall hitting Officer Arias was "hardly the type of unqualified denial that would strip [him] of the ability to request self-defense and necessity instructions." We disagree. Ford never testified that he engaged in the charged conduct or that he used any force to repel Officer Arias's alleged attack. We conclude that Ford's testimony that he did not recall hitting Officer Arias and that he did not think he hit Officer Arias does not raise the issue of self-defense. Therefore, only the State's evidence could possibly have raised the issue of self-defense. *See Johnson v. State*, 715 S.W.2d 402, 405 (Tex. App.–Houston [1st Dist.] 1986, pet. ref'd) (providing that the State's evidence may have raised the issue of self-defense although the defendant's testimony did not raise it). From our review of the record, however, we conclude the State's evidence did not raise the issue of self-defense. Therefore, Ford was not entitled to an instruction on self-defense in the jury charge. *See Granger*, 3 S.W.3d at 38; *Hudson*, 145 S.W.3d at 324-25; *Withers*, 994 S.W.2d at 745 (concluding that defendant was entitled to an instruction of

12

self-defense and necessity because she admitted the conduct required to raise the self-defense issue).

As to Ford's claim that he was entitled to an instruction on necessity, again, Ford's defense was that he did not think he hit Officer Arias, and he did not recall hitting Officer Arias. Without first admitting that the conduct occurred, Ford was not entitled to an instruction on necessity in the jury charge. *See Wood*, 271 S.W.3d at 334; *Maldonado*, 902 S.W.2d at 712. Ford's second issue is overruled.

### III. MOTION TO SUPPRESS

By his third issue, Ford contends that the trial court committed harmful error by admitting incriminating statements he made to Hartnett. Specifically, Ford argues that his statement to Hartnett that he assaulted an officer was acquired in violation of his rights pursuant to *Miranda v. Arizona* and article 38.22 of the code of criminal procedure. *See Miranda v. Arizona*, 384 U.S. 436 (1966); TEX. CODE CRIM. PROC. ANN. article 38.33 (Vernon 2005). Ford also asserts that his statement was introduced in violation of his rights under "the patient privacy provisions of the Occupations Code." *See* TEX. OCC. CODE ANN. § 159.002 (Vernon 2004), § 159.003(b) (Vernon Supp. 2008).

### A. Standard of Review

We review a trial court's denial of motion to suppress evidence under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give "almost total deference to a trial court's determination of historical facts" and review de novo the court's application of the law. *Guzman*, 955 S.W.2d at 88-89. "On appellate review, we must examine the record as it existed at the time of the suppression hearing." *O'Hara v. State*,

27 S.W.3d 548, 551 (Tex. Crim. App. 2000). Furthermore, as explained by the court of criminal appeals:

> [t]he mere filing of a motion to suppress does not thrust a burden on the State to show compliance with Miranda or article 38.22 warnings unless and until the defendant proves that the statements he wishes to exclude were the product of custodial interrogation. Thus, the State has no burden at all unless "the record as a whole clearly establishe[s]" that the defendant's statement was the product of custodial interrogation by an agent for law enforcement. It is the defendant's initial burden to establish those facts on the record.

*Id.*

## B. ANALYSIS

Ford argues, that a "jailhouse nurse is sufficiently connected with law enforcement that it should be presumed that the jailhouse nurse is an agent of law enforcement for the purpose of *Miranda* and Article 38.22." However, "[n]ot all government workers must be familiar with and ready to administer *Miranda* warnings or comply with the procedural requirements of Article 38.22." *Wilkerson v. State*, 173 S.W.3d 521, 528 (Tex. Crim. App. 2005). "[W]hen 'the official has not been given police powers, Miranda has been held inapplicable to questioning by school officials, welfare investigators, medical personnel, prison counselors, and parole or probation officers.'" *Id.* The court of criminal appeals has concluded that *Miranda* warnings are only required when a non-law enforcement state agent is acting in tandem with police to investigate and gather evidence for a criminal prosecution. *Id.* To determine if this type of tandem relationship exists, we consider the following: (1) information about the relationship between the police and Hartnett; (2) Hartnett's actions and perceptions; and (3) Ford's perceptions of the encounter. *See id.* at 530-31.

Although Ford asserts that Hartnett was required to read him *Miranda* warnings and comply with 38.22, there is no evidence in the record supporting a conclusion that Hartnett, who was not a state employee, was a state agent. *See Id.* at 527-528 (providing that "state employment clearly makes a person an 'agent of the State'"). However, even if Hartnett were a state agent, there is no evidence in the record that Hartnett acted in tandem with police to investigate and gather evidence against Ford. There is no evidence that a relationship had developed between the police and Hartnett with regard to the allegations that Ford had assaulted Officer Arias. There is no evidence that Hartnett considered herself to be acting in tandem with the police or that Ford held such a perception. The only actions that Ford provides to support a finding that Hartnett may have been acting in tandem with police is the fact that she worked at the jail and asked him how he was injured. Based on our review of the record, we cannot conclude that Hartnett was acting in tandem with police to investigate and gather evidence for a criminal prosecution. *Wilkerson*, 173 S.W.3d at 528. Without such a showing, even if Hartnett were a non-law enforcement state agent, she would not have been required to administer *Miranda* warnings or comply with article 38.22. *See id.* at 529. Therefore, the trial court was not required to suppress Ford's incriminating statements on the basis that Hartnett did not read *Miranda* warnings to him or that she did not comply with article 38.22. *See id.*

Next, Ford asserts that the occupations code "creates a privacy interest in a patient's communication with a physician or with another collecting medical information." *See* TEX. OCC. CODE ANN. § 159.002(a) (providing that "[a] communication between a physician and a patient, relative to or in connection with any professional services as a physician to the patient, is confidential and privileged and may not be disclosed"). Ford

15

urges this Court to conclude that Hartnett violated section 159.003(b) of the Texas Occupations Code because she "released information before trial so the [S]tate could 'investigate or substantiate criminal charges against a patient.'" *See id.* § 159.003(b) (stating that "[t]his section does not authorize the release of confidential information to investigate or substantiate criminal charges against a patient"). We decline do so.

Section 159.003 of the Texas Occupations Code is included in Title 3 ("Health Professions"), Subtitle B, ("Physicians"). *See id.* In section 151.052(a)(4) of the occupations code, nurses are specifically exempted from subtitle B. *See id.* § 151.052(a)(4) (Vernon 2004) (providing that subtitle B does not apply to "a registered nurse or licensed vocational nurse engaged strictly in the practice of nursing in accordance with the applicable licensing acts and other laws of this state"). Because Hartnett was exempt from section 159.003(b), the trial court was not required to suppress Ford's statement on the basis that she allegedly violated the physician-client privilege. Thus, after giving "almost total deference to the trial court's determination of historical facts" and reviewing de novo the court's application of the law, we conclude that the trial court did not abuse its discretion by denying Ford's motion to suppress. *Guzman*, 955 S.W.2d at 88-89. We overrule Ford's third issue.

## IV. FACTUAL SUFFICIENCY OF THE EVIDENCE

By his fourth and final issue, Ford generally contends that the evidence is factually insufficient to support his conviction. More specifically, Ford argues that the evidence is factually insufficient "to show that [he] intentionally, knowingly, or recklessly struck [Officer] Arias." Ford also argues that the evidence is factually insufficient "to show that [Officer]

16

Arias was engaged in the lawful discharge of his official duties at the time of the alleged assault."

## A. STANDARD OF REVIEW

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not reverse the jury's verdict unless, we can say with some objective basis in the record, the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417. "Although authorized to disagree with the jury's determination even if probative evidence exists which supports the verdict, a reviewing court must give due deference to the fact finder's determinations concerning the weight and credibility of the evidence and will reverse the fact finder's determination only to arrest the occurrence of a manifest injustice." *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003). Factual sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd).

## B. Discussion

As set out above, in order to convict Ford of assault on a public servant, the State had to prove that Ford intentionally, knowingly, or recklessly caused bodily injury to Officer Arias. *See* TEX. PENAL CODE ANN. § 22.01. The State also had to prove the following: (1) Officer Arias was a public servant; (2) Ford knew that Officer Arias was a public servant; (3) Officer Arias was discharging official duties when he was assaulted; and (4) Officer

17

Arias was lawfully discharging those official duties. *Hall*, 158 S.W.3d at 473 (citing TEX. PENAL CODE ANN. § 22.01). Ford only challenges the sufficiency of the evidence to establish that he intentionally, knowingly, or recklessly caused bodily injury, and that Officer Arias was lawfully discharging his official duties.

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to . . . cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Finally, a person acts "recklessly . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c).

The State presented evidence that while being restrained in his cell by detention officers at the CDC, Ford swung his arm and hit Officer Arias in the head, causing pain. Both Officers Garza and Arias testified that Ford was cursing and shouting, "I want to play," when they attempted to restrain him. According to both officers, Ford was resisting their attempts to cuff him when Ford struck Officer Arias. After the officers cuffed Ford, Ford wrapped his legs around Officer Arias's leg and would not release him. Finally, Hartnett testified that Ford told her that he had assaulted an officer when they "had taken him down."

As contrary evidence, Ford points to the following: (1) Officer Arias did not know whether he was hit by Ford's elbow or hand; (2) Ford had one hand cuffed when Officer Arias intervened; (3) the testimonies of Officers Garza and Arias were inconsistent regarding Ford's body position when they were restraining him; (4) Officer Garza did not

18

see Ford strike Officer Arias and did not know "what struck him"; (5) Officer Arias was seen administering ammonia to Ford when Ford had to be restrained earlier in the evening; (6) Officer Arias participated in moving Ford to a cell that was outside the view of the CDC's video cameras; (7) Officer Garza repeatedly returned to Ford's cell to make a positive identification of him although Officer Gohlke had already told him that he was Ford; (8) Ford testified that Officer Garza struck him in the face; and (9) Ford hit his head on the toilet when officers attempted to restrain him.

Ford alleges that the evidence "supports an inference that [he] was merely struggling to escape [Officer] Garza's attacks when his arm accidentally struck [Officer] Arias." Ford also asserts that the evidence supports a conclusion that he suffered abuse at the CDC, thus allowing a determination that Officer Arias "participated in or allowed (despite being the shift supervisor) the use of excessive force than it does in favor of a lawful exercise of authority" finding. However, after reviewing the evidence, the jury determined that the evidence supported a finding that Ford had the requisite mens rea and that Officer Arias was lawfully discharging his official duties. As a reviewing court, we must give due deference to the jury's determinations concerning the weight and credibility of the evidence. *See Swearingen*, 101 S.W.3d at 97. We will only reverse the fact finder's determination to prevent the occurrence of a manifest injustice. *See id.* We have reviewed the evidence in a neutral light, and cannot conclude that the evidence supporting the verdict is so weak that the jury's verdict seems clearly wrong and manifestly unjust. *See Watson*, 204 S.W.3d at 414-15. Furthermore, we conclude that the jury's verdict is not against the great weight and preponderance of the evidence. *See id.* We overrule Ford's fourth issue.

19

## V. Conclusion

We affirm the trial court's judgment.

NELDA V. RODRIGUEZ
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and
filed this 9th day of April, 2009.