NUMBER 13-07-00250-CR 



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


DAVID FORD, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 94th District Court 

of Nueces County, Texas.

 


MEMORANDUM OPINION


Before Justices Yañez, Rodriguez, and Benavides 


Memorandum Opinion by Justice Rodriguez



 A jury convicted appellant, David Ford, of assault on a public servant and assessed
his sentence at four years' imprisonment. See Tex. Penal Code Ann. § 22.01 (Vernon
Supp. 2008). By four issues, Ford contends: (1-2) the trial court committed reversible error
by not including the lesser included offense of misdemeanor assault and the issues of self-defense and necessity in its jury charge; (3) the trial court committed reversible error by
allowing the State to introduce evidence of Ford's alleged confession to a state jail nurse;
and (4) the evidence was factually insufficient. We affirm.

I. Background

 During Ford's trial, the State presented the testimony of Amy Hartnett, R.N., and 
Officers Victor Uribe, Juan Roberto Reyes, Jacob Garza, Rolando Arias, Patrick
McMenamy, Steven Gohlke, Frank Bautista, and Rosemary Sifuentes. According to
Officer Uribe, while responding to a complaint that a man was "trying to start some fights,"
he discovered Ford lying on the ground between two buildings. When Officer Uribe
attempted to "make contact with him [Ford], he was totally out of it." Ford was belligerent,
cursing, and "getting kind of violent." When Officer Uribe asked Ford for his name, Ford
answered, "You bitch." Officer Uribe looked in Ford's wallet for identification and found a
driver's license belonging to Charles Teague. The photograph on the driver's license
"looked very similar to [Ford]." Officer Uribe arrested Ford on suspicion of public
intoxication and transported him to the City Detention Center (CDC). Once at the CDC,
Ford was admitted under the name Charles Teague.

 Officer Garza testified that, after Ford was placed in a holding cell at the CDC, Ford
made a racial epithet and spat at him. Officer Reyes testified that Officer Garza called for
assistance because Ford was spitting and acting aggressively. Officer Garza stated that
"[w]hen an arrested person becomes -- when he's that intoxicated and makes those types
of actions, he is put in restraints and a spit shield is applied to prevent him from spitting." 
According to Officer Garza, it is essential that a prisoner who spits is restrained in order to
"prevent him from harming himself and other . . . inmates or officers" because the prisoner
may have a communicable disease. Officer Reyes testified that he and Officers Bautista
and Sifuentes assisted Officer Garza with restraining Ford. According to Officer Reyes,
the officers restrained Ford using a maneuver he believed was called a "leg sweep." (1) Ford
was later released from his restraints, given a shower, and moved to another holding cell. When Officers McMenamy and Gohlke arrived at the CDC to process another
prisoner, Officer Garza asked them to thank the officers in their department for bringing
Teague to the CDC. Officers McMenamy and Gohlke informed Officer Garza that the
prisoner could not be Teague because he was currently in prison. Officers McMenamy and
Gohlke went to Ford's cell and, after "observing Ford's face," Officer Gohlke identified the
prisoner as David Ford. Once the officers stated that the prisoner was Ford, Officer Garza
began the process of positively identifying him. According to Officer Garza, fingerprints
could not be taken because of Ford's belligerence and combativeness. Instead, he had
to rely on a mug shot on file.

 The mug shot showed that Ford had a scar on the bridge of his nose. Officer Garza
went to Ford's cell to look for the scar. When he entered Ford's cell, he moved Ford in an
effort to awaken him so that he could look at his face. Ford awoke and grabbed a phone
receiver and swung it at him. Officer Garza "walked with him . . . towards the corner and
did what [is] call[ed] an arm drag to take him down." (2) Officer Arias went into the cell to
assist Officer Garza. During the struggle, Ford repeatedly shouted an obscenity and said,
"I want to play." According to Officer Garza, he could not get Ford's hand behind his back
to cuff him, and Ford "kept trying to grab his hand . . . .  And at that point is when [Ford]
was free and Officer Arias was struck in the head." Officer Garza stated:

 Once we realized that we were not able to cuff him from behind, we ended
up cuffing him in front. Once that was done, we leg ironed his legs together. 
And we ended up having to cuff him from cuff to leg iron to keep him from -
you know, to control him.


Officer Garza explained that Ford then wrapped his legs around Officer Arias's leg and
would not release it. He had to move "the shackle up to where - right around . . . [Ford's]
shin area and tensed it down. And at that point he released [Officer Arias's] leg." Officer
Garza testified that Officer Arias was injured during the struggle.

 Officer Arias testified that he heard yelling and banging from an open cell. He ran
to the cell and found Officer Garza struggling with Ford. When asked to describe the
struggle, Officer Arias stated,

 To me it seemed like [Officer Garza] was trying to restrain [Ford]. And [Ford]
was on his back trying to - I mean, he wasn't wanting to give up. He wasn't
wanting to turn around. I went in right away and grabbed one of his hands. 
And I repeatedly told [Ford], stop resisting, just relax, relax, stop resisting. 
And he just kept going.


Officer Arias stated that Ford was kicking, spitting, cursing, and shouting, "I want to play." 
According to Officer Arias, when Officer Garza released Ford's cuffed hand, Officer Arias
grabbed that hand, and, while Ford's other hand was free, Ford hit Officer Arias on his
head. Officer Arias stated that he was hit hard and felt pain. 

 Ford was then transferred to the county jail. Hartnett, who works as a nurse at the
jail and who is employed by Christus Spohn Memorial Hospital, testified that when a
prisoner arrives at the jail they are automatically sent to the nurse's station to "insure that
the person is healthy enough to be placed in a holding cell." Hartnett observed Ford to be
conscious; he did not appear drowsy, he could walk, and he did not complain of any pain. 
Hartnett described Ford's appearance as "disheveled," and noticed a prominent red mark
over his eye. Ford initially refused to answer Hartnett's questions, but eventually told her
that "he had assaulted an officer and they had taken him down and somehow in that
process he had gotten injured." According to Hartnett, Ford stated that "he had swung at
an officer and he - somehow after that, you know, when they subdued him, he got injured." 
When asked what Ford had swung at the officer, he "mentioned a telephone." Hartnett
explained that she documented Ford's explanation on a county jail form that he did not sign
because he was in handcuffs. (3) 

 Ford testified on his own behalf. He stated that on the day he was arrested, he had
ingested half a gallon of tequila, an "eight ball of cocaine," which he described as an eighth
of an ounce of cocaine, and "a little over a gram of methamphetamine." Ford also stated
that he takes medication for his depression. According to Ford, if he mixes cocaine and
"meth" with his medication, he will "black out." Ford claimed that he did not recall being
taken to the CDC and did not realize that he had been incarcerated. Ford stated, "I don't
remember anything in the [CDC]." However, he remembered telling the officers that he
was not Teague and that he was David Ford. Ford also remembered talking to Hartnett,
who he said woke him up and told him that he had assaulted someone and that he had
spat at the officers at the CDC. Ford claimed that he told Hartnett that he did not know
what happened at the CDC and that he had ingested half a gallon of tequila. Ford stated
that he refused to sign the acceptance form presented to him by Hartnett because it stated
that he had assaulted an officer.

 On cross-examination, Ford explained that he had Teague's driver's license in his
wallet because he had used it to acquire medical attention after he was shot in the foot. 
Ford stated that he did not remember anything that happened at the CDC except being
struck in the face by Officer Garza. Ford maintained that he did not recall hitting Officer
Arias and stated, "I don't think I hit him. In my - by my remembrance, I don't think I hit
him."

 The jury found Ford guilty of assault on a public servant and assessed his
punishment at four years' imprisonment. This appeal ensued.

II. Jury Charge

 By his first issue, Ford contends the trial court committed reversible error by denying
his request to include an instruction in the jury charge of the lesser-included offense of
misdemeanor assault. Specifically, Ford argues that some evidence existed to show that
the officers at the CDC used excessive force against him and that he did not know that
Officer Arias was a public servant. By his second issue, Ford contends that the trial court
committed reversible error when it denied his request for jury charge instructions on the
issues of self-defense and necessity.

A. Lesser-Included Offense

1. Applicable Law

a. Elements of Lesser-Included Offense

 A defendant is entitled to an instruction in the jury charge of a lesser-included
offense if (1) the lesser-included offense is included within the proof necessary to establish
the charged offense, and (2) some evidence exists in the record permitting a rational jury
to find that if the defendant is guilty, he is guilty of only the lesser offense. Bignall v. State,
887 S.W.2d 21, 23 (Tex. Crim. App. 1994) (en banc); Hall v. State, 158 S.W.3d 470, 473
(Tex. Crim. App. 2005); see Tex. Code Crim. Proc. art. 37.09(1) (Vernon 2006) (providing
that if an offense "is established by proof of the same or less than all the facts required to
establish the commission of the offense charged," it is a lesser included offense). In this
case, under the second prong, there must be some evidence from which a rational jury
could acquit appellant of assault on a public servant while convicting him of the lesser-included offense of misdemeanor assault. Hall, 158 S.W.3d at 473. We review all of the
evidence presented to the trial court to determine if it erred by failing to include an
instruction in the charge on the lesser-included offense. Rousseau v. State, 855 S.W.2d
666, 673 (Tex. Crim. App. 1993) (en banc).

b. Misdemeanor Assault

 A person commits misdemeanor assault if the person "intentionally, knowingly, or
recklessly causes bodily injury to another." Tex. Penal Code Ann. § 22.01 (Vernon Supp.
2008). In Hall v. State, the court of criminal appeals concluded that misdemeanor assault
is included within the proof necessary to establish assault on a public servant. 158 S.W.3d
at 473.

c. Assault on a Public Servant

 The offense of assault on a public servant requires proof of misdemeanor assault
and the following four additional elements: (1) the person assaulted was a public servant;
(2) the defendant knew that the person he assaulted was a public servant; (3) the person
assaulted was discharging official duties when he was assaulted; and (4) the person
assaulted was lawfully discharging those official duties. Hall, 158 S.W.3d at 473 (citing
Tex. Penal Code Ann. § 22.01(b)(1)). "If there is affirmative evidence in the record that
negates one of the four additional elements of assault on a public servant, yet admits the
underlying assault, appellant would be entitled to a lesser-included charge of misdemeanor
assault." See Hall, 158 S.W.3d at 474.

 The court of criminal appeals has generally interpreted the "lawful discharge of
official duties" broadly, such that "as long as the officer was acting within his capacity as
a peace officer, he was acting within the lawful discharge of his official duties." Id.

 An officer or employee of a correctional facility is justified in using force
against a person in custody when and to the degree the officer or employee
reasonably believes the force is necessary to maintain the security of the
correctional facility, the safety or security of other persons in custody or
employed by the correctional facility, or his own safety or security.


Tex. Penal Code Ann. § 9.53 (Vernon 2003). A correctional officer is lawfully discharging
his duties if his use of force falls within the above definition, and if the officer is assaulted,
"the actor is guilty of assault of a public servant rather than mere misdemeanor assault." 
Hall, 158 S.W.3d at 475. However, there are limits to the lawful discharge of official duties,
which require that "the public servant is not criminally or tortiously abusing his office as a
public servant by acts of, for example, 'official oppression' or 'violations of the civil rights
of a person in custody' or the use of unlawful, unjustified force." Id. at 474-75.

2. Discussion

 As stated above, the court of criminal appeals has concluded that misdemeanor
assault is included within the proof necessary to establish assault on a public servant. Id.
at 473. Thus, the first prong entitling Ford to an instruction in the jury charge has been
satisfied. See Bignall, 887 S.W.2d at 23; see also Hall, 158 S.W.3d at 473. We must now
determine, under the second prong, whether there is some evidence in the record
permitting a rational jury to find that if Ford is guilty, he is guilty only of misdemeanor
assault. See Hall, 158 S.W.3d at 473-74; see also Bignall, 887 S.W.2d at 23.

 In his first issue, Ford claims that there is some evidence supporting a finding that
Officer Arias was not acting in the lawful discharge of his official duties--thus negating the
fourth element of assault on a public servant. Ford would be entitled to the lesser-included
instruction only if there is some record evidence, from any source, that showed that Officer
Arias criminally or tortiously abused his status as a public servant at the time he was
assaulted. See Hall, 158 S.W.3d at 475.

 Ford alleges that Officer Arias was not lawfully discharging his official duties when
Ford hit him because there is some evidence that other officers abused him. Ford argues
that a rational jury could find that Officer Arias, as the "shift leader," was "cognizant of,
participated [in], and even condoned the excessive force used against" him. Specifically,
Ford points to the following: (1) he testified that Officer Garza hit him; (2) Officer Arias had
been seen administering ammonia to Ford after the first time Ford was retrained, (3)
Officer Arias participated in moving Ford to a cell that was outside the view of the CDC's
video cameras; and (4) Ford hit his head on a toilet when he was restrained.

 The officers who encountered Ford that day testified that Ford was uncooperative,
combative, spitting, shouting obscenities, and that they had to restrain him due to his
behavior. Officer Arias stated that the force he used was necessary and not excessive. 
The evidence presented did not establish that Officer Arias was either aware of or
condoned the use of excessive force or that he used excessive force at the time he was
assaulted. Although Ford testified that Officer Garza hit him, Ford never testified that
Officer Arias used excessive force or that Officer Arias was aware that Officer Garza
allegedly hit him. None of the officers present testified that excessive force was used on
Ford. The evidence presented showed that Officer Arias found Officer Garza struggling
to restrain Ford in his cell. When Officer Arias asked Ford to calm down and stop resisting,
Ford shouted obscenities and stated that he wanted "to play." The evidence also showed
that Ford struck Officer Arias in the head while Officer Arias was attempting to assist
Officer Garza in restraining Ford. See Tex. Penal Code Ann. § 9.53. Based on the
evidence, Officer Arias was acting within his capacity as a peace officer. Because Officer
Arias was acting in the lawful discharge of his official duties, Ford has not negated the
fourth element of assault on a public servant. See id.; Hall, 158 S.W.3d at 474.

 Next, Ford argues that there is some evidence supporting a finding that he did not
know that Officer Arias was a public servant because he was in an "incoherent state,"
negating the second element of assault on a public servant. However, section 22.01(d) of
the penal code specifically provides that "the actor is presumed to have known the person
assaulted was a public servant . . . if the person was wearing a distinctive uniform or badge
indicating the person's employment as a public servant." Tex. Penal Code Ann. §
22.01(d). Here, Officer Arias was wearing his uniform and a badge at the time Ford struck
him; thus, we must presume Ford was aware that Officer Arias was a public servant. See
id. Ford does not contend that he rebutted this presumption. Nonetheless, we reject any
suggestion that appellant rebutted the presumption by alleging that he was in an incoherent
state. "Voluntary intoxication does not constitute a defense to the commission of a crime,"
and the evidence presented showed that Ford was in an incoherent state at the CDC
because he voluntarily became intoxicated by drinking half a gallon of tequila and 
ingesting cocaine and methamphetamine. See Tex. Pen. Code Ann. § 8.04(a) (Vernon
2003). Therefore, Ford did not rebut the presumption that he knew Officer Arias was a
public servant; and, he failed to negate the second element of assault on a public servant. 
See Hall, 158 S.W.3d at 474. Ford does not challenge the first and third elements, and we
find nothing in the record that would negate those elements. See id. Because there is no
affirmative evidence in the record negating one of the four additional elements of assault
on a public servant, we conclude that Ford was not entitled to a lesser-included charge of
misdemeanor assault. See id. We overrule Ford's first issue.

B. Defenses

 By his second issue, Ford claims that he was entitled to jury instructions on self-defense and necessity. A defendant is entitled to an instruction in the jury charge on any
defensive issue raised by the evidence from any source, regardless of whether the
evidence is strong, weak, unimpeached or contradicted, or credible or not credible. 
Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); Hudson v. State, 145 S.W.3d
323, 324-25 (Tex. App.-Fort Worth 2004, pet. ref'd). "All statutory affirmative defenses
'justify the defendant's admitted participation in the act itself.'" East v. State, 76 S.W.3d
736, 738 (Tex. App.-Waco 2002, no pet.) (quoting Sanders v. State, 707 S.W.2d 78, 81
(Tex. Crim. App. 1986)). A person is justified in using force against another when and to
the degree the actor reasonably believes the force is immediately necessary to protect the
actor against the other's use or attempted use of unlawful force. Tex. Penal Code Ann.
§ 9.31 (Vernon Supp. 2008). To raise the issue of self-defense, a defendant must admit
to the conduct in the statute under which he is charged. Withers v. State, 994 S.W.2d 742,
745 (Tex. App.-Corpus Christi 1999, pet. ref'd). In other words, the defendant must admit
that he used force against another before he is entitled to an instruction of self-defense. 
See id.

 The affirmative defense of necessity attempts to justify a defendant's conduct that
would otherwise be criminal. Young v. State, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999). 
A defendant cannot establish that his conduct was justified by "necessity" without first
admitting that the conduct occurred. Wood v. State, 271 S.W.3d 329, 334 (Tex. App.-San
Antonio 2008, pet. ref'd) (citing McGarity v. State, 5 S.W.3d 223, 227 (Tex. App.-San
Antonio 1999, no pet.)); Maldonado v. State, 902 S.W.2d 708, 712 (Tex. App.-El Paso
1995, no writ).

 Ford maintains that there is some evidence that he acted in self-defense because
his testimony that he did not recall hitting Officer Arias was "hardly the type of unqualified
denial that would strip [him] of the ability to request self-defense and necessity
instructions." We disagree. Ford never testified that he engaged in the charged conduct
or that he used any force to repel Officer Arias's alleged attack. We conclude that Ford's
testimony that he did not recall hitting Officer Arias and that he did not think he hit Officer
Arias does not raise the issue of self-defense. Therefore, only the State's evidence could
possibly have raised the issue of self-defense. See Johnson v. State, 715 S.W.2d 402,
405 (Tex. App.-Houston [1st Dist.] 1986, pet. ref'd) (providing that the State's evidence
may have raised the issue of self-defense although the defendant's testimony did not raise
it). From our review of the record, however, we conclude the State's evidence did not raise
the issue of self-defense. Therefore, Ford was not entitled to an instruction on self-defense in the jury charge. See Granger, 3 S.W.3d at 38; Hudson, 145 S.W.3d at 324-25;
Withers, 994 S.W.2d at 745 (concluding that defendant was entitled to an instruction of
self-defense and necessity because she admitted the conduct required to raise the self-defense issue).

 As to Ford's claim that he was entitled to an instruction on necessity, again, Ford's
defense was that he did not think he hit Officer Arias, and he did not recall hitting Officer
Arias. Without first admitting that the conduct occurred, Ford was not entitled to an
instruction on necessity in the jury charge. See Wood, 271 S.W.3d at 334; Maldonado,
902 S.W.2d at 712. Ford's second issue is overruled.

III. Motion to Suppress

 By his third issue, Ford contends that the trial court committed harmful error by
admitting incriminating statements he made to Hartnett. Specifically, Ford argues that his
statement to Hartnett that he assaulted an officer was acquired in violation of his rights
pursuant to Miranda v. Arizona and article 38.22 of the code of criminal procedure. See
Miranda v. Arizona, 384 U.S. 436 (1966); Tex. Code Crim. Proc. Ann. article 38.33
(Vernon 2005). Ford also asserts that his statement was introduced in violation of his
rights under "the patient privacy provisions of the Occupations Code." See Tex. Occ.
Code Ann. § 159.002 (Vernon 2004), § 159.003(b) (Vernon Supp. 2008).

A. Standard of Review

 We review a trial court's denial of motion to suppress evidence under a bifurcated
standard of review. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000);
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give "almost total
deference to a trial court's determination of historical facts" and review de novo the court's
application of the law. Guzman, 955 S.W.2d at 88-89. "On appellate review, we must
examine the record as it existed at the time of the suppression hearing." O'Hara v. State,
27 S.W.3d 548, 551 (Tex. Crim. App. 2000). Furthermore, as explained by the court of
criminal appeals:

 [t]he mere filing of a motion to suppress does not thrust a burden on the
State to show compliance with Miranda or article 38.22 warnings unless and
until the defendant proves that the statements he wishes to exclude were the
product of custodial interrogation. Thus, the State has no burden at all unless
"the record as a whole clearly establishe[s]" that the defendant's statement
was the product of custodial interrogation by an agent for law enforcement. 
It is the defendant's initial burden to establish those facts on the record.


Id.

B. Analysis

 Ford argues, that a "jailhouse nurse is sufficiently connected with law enforcement
that it should be presumed that the jailhouse nurse is an agent of law enforcement for the
purpose of Miranda and Article 38.22." However, "[n]ot all government workers must be
familiar with and ready to administer Miranda warnings or comply with the procedural
requirements of Article 38.22." Wilkerson v. State, 173 S.W.3d 521, 528 (Tex. Crim. App.
2005). "[W]hen 'the official has not been given police powers, Miranda has been held
inapplicable to questioning by school officials, welfare investigators, medical personnel,
prison counselors, and parole or probation officers.'" Id. The court of criminal appeals has
concluded that Miranda warnings are only required when a non-law enforcement state
agent is acting in tandem with police to investigate and gather evidence for a criminal
prosecution. Id. To determine if this type of tandem relationship exists, we consider the
following: (1) information about the relationship between the police and Hartnett; (2)
Hartnett's actions and perceptions; and (3) Ford's perceptions of the encounter. See id.
at 530-31.

 Although Ford asserts that Hartnett was required to read him Miranda warnings and
comply with 38.22, there is no evidence in the record supporting a conclusion that Hartnett,
who was not a state employee, was a state agent. See Id. at 527-528 (providing that "state
employment clearly makes a person an 'agent of the State'"). However, even if Hartnett
were a state agent, there is no evidence in the record that Hartnett acted in tandem with
police to investigate and gather evidence against Ford. There is no evidence that a
relationship had developed between the police and Hartnett with regard to the allegations
that Ford had assaulted Officer Arias. There is no evidence that Hartnett considered
herself to be acting in tandem with the police or that Ford held such a perception. The only
actions that Ford provides to support a finding that Hartnett may have been acting in
tandem with police is the fact that she worked at the jail and asked him how he was injured. 
Based on our review of the record, we cannot conclude that Hartnett was acting in tandem
with police to investigate and gather evidence for a criminal prosecution. Wilkerson, 173
S.W.3d at 528. Without such a showing, even if Hartnett were a non-law enforcement
state agent, she would not have been required to administer Miranda warnings or comply
with article 38.22. See id. at 529. Therefore, the trial court was not required to suppress
Ford's incriminating statements on the basis that Hartnett did not read Miranda warnings
to him or that she did not comply with article 38.22. See id.

 Next, Ford asserts that the occupations code "creates a privacy interest in a
patient's communication with a physician or with another collecting medical information." 
See Tex. Occ. Code Ann. § 159.002(a) (providing that "[a] communication between a
physician and a patient, relative to or in connection with any professional services as a
physician to the patient, is confidential and privileged and may not be disclosed"). Ford
urges this Court to conclude that Hartnett violated section 159.003(b) of the Texas
Occupations Code because she "released information before trial so the [S]tate could
'investigate or substantiate criminal charges against a patient.'" See id. § 159.003(b)
(stating that "[t]his section does not authorize the release of confidential information to
investigate or substantiate criminal charges against a patient"). We decline do so.

 Section 159.003 of the Texas Occupations Code is included in Title 3 ("Health
Professions"), Subtitle B, ("Physicians"). See id. In section 151.052(a)(4) of the
occupations code, nurses are specifically exempted from subtitle B. See id. §
151.052(a)(4) (Vernon 2004) (providing that subtitle B does not apply to "a registered nurse
or licensed vocational nurse engaged strictly in the practice of nursing in accordance with
the applicable licensing acts and other laws of this state"). Because Hartnett was exempt
from section 159.003(b), the trial court was not required to suppress Ford's statement on
the basis that she allegedly violated the physician-client privilege. Thus, after giving
"almost total deference to the trial court's determination of historical facts" and reviewing
de novo the court's application of the law, we conclude that the trial court did not abuse its
discretion by denying Ford's motion to suppress. Guzman, 955 S.W.2d at 88-89. We
overrule Ford's third issue.

IV. Factual Sufficiency of the Evidence

 By his fourth and final issue, Ford generally contends that the evidence is factually
insufficient to support his conviction. More specifically, Ford argues that the evidence is
factually insufficient "to show that [he] intentionally, knowingly, or recklessly struck [Officer]
Arias." Ford also argues that the evidence is factually insufficient "to show that [Officer]
Arias was engaged in the lawful discharge of his official duties at the time of the alleged
assault."

A. Standard of Review

 In a factual sufficiency review, we review the evidence in a neutral light to determine
whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust or the jury's verdict is against the great weight and preponderance of the evidence. 
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not
reverse the jury's verdict unless, we can say with some objective basis in the record, the
great weight and preponderance of the evidence contradicts the verdict. Id. at 417. 
"Although authorized to disagree with the jury's determination even if probative evidence
exists which supports the verdict, a reviewing court must give due deference to the fact
finder's determinations concerning the weight and credibility of the evidence and will
reverse the fact finder's determination only to arrest the occurrence of a manifest injustice." 
Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003). Factual sufficiency of the
evidence is measured by the elements of the offense as defined by a hypothetically correct
jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Adi v. State, 94
S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002, pet. ref'd).B. Discussion As set out above, in order to convict Ford of assault on a public servant, the State
had to prove that Ford intentionally, knowingly, or recklessly caused bodily injury to Officer
Arias. See Tex. Penal Code Ann. § 22.01. The State also had to prove the following: (1)
Officer Arias was a public servant; (2) Ford knew that Officer Arias was a public servant;
(3) Officer Arias was discharging official duties when he was assaulted; and (4) Officer
Arias was lawfully discharging those official duties. Hall, 158 S.W.3d at 473 (citing Tex.
Penal Code Ann. § 22.01). Ford only challenges the sufficiency of the evidence to
establish that he intentionally, knowingly, or recklessly caused bodily injury, and that Officer
Arias was lawfully discharging his official duties.

 "A person acts intentionally, or with intent, with respect . . . to a result of his conduct
when it is his conscious objective or desire to . . . cause the result." Tex. Penal Code Ann.
§ 6.03(a) (Vernon 2003). "A person acts knowingly, or with knowledge, with respect to a
result of his conduct when he is aware that his conduct is reasonably certain to cause the
result." Id. § 6.03(b). Finally, a person acts "recklessly . . . when he is aware of but
consciously disregards a substantial and unjustifiable risk that the circumstances exist or
the result will occur." Id. § 6.03(c).

 The State presented evidence that while being restrained in his cell by detention
officers at the CDC, Ford swung his arm and hit Officer Arias in the head, causing pain. 
Both Officers Garza and Arias testified that Ford was cursing and shouting, "I want to play,"
when they attempted to restrain him. According to both officers, Ford was resisting their
attempts to cuff him when Ford struck Officer Arias. After the officers cuffed Ford, Ford
wrapped his legs around Officer Arias's leg and would not release him. Finally, Hartnett
testified that Ford told her that he had assaulted an officer when they "had taken him
down."

 As contrary evidence, Ford points to the following: (1) Officer Arias did not know
whether he was hit by Ford's elbow or hand; (2) Ford had one hand cuffed when Officer
Arias intervened; (3) the testimonies of Officers Garza and Arias were inconsistent
regarding Ford's body position when they were restraining him; (4) Officer Garza did not
see Ford strike Officer Arias and did not know "what struck him"; (5) Officer Arias was seen
administering ammonia to Ford when Ford had to be restrained earlier in the evening; (6)
Officer Arias participated in moving Ford to a cell that was outside the view of the CDC's
video cameras; (7) Officer Garza repeatedly returned to Ford's cell to make a positive
identification of him although Officer Gohlke had already told him that he was Ford; (8)
Ford testified that Officer Garza struck him in the face; and (9) Ford hit his head on the
toilet when officers attempted to restrain him.

 Ford alleges that the evidence "supports an inference that [he] was merely
struggling to escape [Officer] Garza's attacks when his arm accidentally struck [Officer]
Arias." Ford also asserts that the evidence supports a conclusion that he suffered abuse
at the CDC, thus allowing a determination that Officer Arias "participated in or allowed
(despite being the shift supervisor) the use of excessive force than it does in favor of a
lawful exercise of authority" finding. However, after reviewing the evidence, the jury 
determined that the evidence supported a finding that Ford had the requisite mens rea and
that Officer Arias was lawfully discharging his official duties. As a reviewing court, we must
give due deference to the jury's determinations concerning the weight and credibility of the
evidence. See Swearingen, 101 S.W.3d at 97. We will only reverse the fact finder's
determination to prevent the occurrence of a manifest injustice. See id. We have reviewed
the evidence in a neutral light, and cannot conclude that the evidence supporting the
verdict is so weak that the jury's verdict seems clearly wrong and manifestly unjust. See
Watson, 204 S.W.3d at 414-15. Furthermore, we conclude that the jury's verdict is not
against the great weight and preponderance of the evidence. See id. We overrule Ford's
fourth issue.

V. Conclusion

 We affirm the trial court's judgment.

 NELDA V. RODRIGUEZ

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this 9th day of April, 2009.
1. Officer Reyes stated that when restraining a prisoner using a "leg sweep," the officers "try to bring
[the prisoner] down slowly, bring his feet from under him and bring him down."
2. Officer Garza described an "arm drag" as a procedure "where you grab them [prisoners] by the arm
and you assist them down to the ground."
3. This form was admitted through Ford's testimony as defense exhibit five.